**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF ARKANSAS**
**PINE BLUFF DIVISION**

STEVEN VICTOR WERTZ                                                      PETITIONER

v.                                    5:17-cv-00333-DPM-JJV

WENDY KELLEY, Director,
Arkansas Department of Correction[1]                              RESPONDENT

## PROPOSED FINDINGS AND RECOMMENDATIONS

## INSTRUCTIONS

The following recommended disposition has been sent to Chief United States District Judge D.P. Marshall Jr.   Any party may serve and file written objections to this recommendation. Objections should be specific and should include the factual or legal basis for the objection.   If the objection is to a factual finding, specifically identify that finding and the evidence that supports your objection.   An original and one copy of your objections must be received in the office of the United States District Court Clerk no later than fourteen (14) days from the date of the findings and recommendations.   The copy will be furnished to the opposing party.   Failure to file timely objections may result in waiver of the right to appeal questions of fact.

If you are objecting to the recommendation and also desire to submit new, different, or additional evidence, and to have a hearing for this purpose before the District Judge, you must, at the same time that you file your written objections, include the following:

1.        Why the record made before the Magistrate Judge is inadequate.

---

[1] Pursuant to Rule 2(a) of the Rules Governing Section 2254 Cases in the United States District Courts, the respondent should be named as the state officer who has custody of the petitioner. Therefore, Dexter Payne, Director of the Arkansas Division of Correction, is the appropriately named respondent, and the Clerk is directed to amend the docket to substitute him as the respondent.   *See* Ark. Code Ann. § 12-27-101(a)(1) (establishing the Division of Correction to "assume the custody, control, and management of the state penitentiary" and "provide for the custody, treatment, rehabilitation, and restoration of adult offenders").

2.     Why the evidence proffered at the hearing (if such a hearing is granted) was not offered at the hearing before the Magistrate Judge.

3.     The details of any testimony desired to be introduced at the new hearing in the form of an offer of proof, and a copy, or the original, of any documentary or other non-testimonial evidence desired to be introduced at the new hearing.

From this submission, the District Judge will determine the necessity for an additional evidentiary hearing.   Mail your objections and "Statement of Necessity" to:

> Clerk, United States District Court
> Eastern District of Arkansas
> 600 West Capitol Avenue, Suite A149
> Little Rock, AR 72201-3325

## DISPOSITION

## I.    INTRODUCTION

Petitioner Steven Victor Wertz, an inmate at the Cummins Unit of the Arkansas Division of Correction, brings this 28 U.S.C. § 2254 Petition for Writ of Habeas Corpus.   (Doc. No. 1.) Mr. Wertz was convicted by a jury in Sharp County, Arkansas, of two counts of capital murder. (Doc. No. 12-2 at 1.)   He was sentenced to death.   (*Id.*)   The Arkansas Supreme Court affirmed Mr. Wertz's convictions and sentence on direct appeal, reciting the evidence in the case as follows:

> On the morning of December 31, 1986, Kathy and Terry Watts were found dead in their Ash Flat home by Kathy's mother, Judy Bone.   Ms. Bone found their almost one-year-old son, alive, near his father's body.   During the investigation into the Wattses' deaths, it was discovered that a child-custody matter regarding another child was ongoing between Terry Watts and Wertz's then-wife, Belinda. Ultimately, Wertz became the primary suspect, and, the same day that the bodies were discovered, investigators traveled to Oklahoma, where the Wertzes resided, to inquire.
>
> At that time, Wertz told investigators that he and Jamie Snyder, Jr., the son of a friend, spent the night at Wertz's home on December 30, 1986.   Wertz claimed that he had been sick that evening and that he had gone to the Tinker Air Force Base clinic the next day for treatment, which records corroborated.   In

2

addition to Wertz, another suspect was also investigated.   In 1989, Glenn Collins, an inmate at the Arkansas Department of Correction, wrote two letters to the chief of the Ash Flat Police Department in which he confessed to committing two murders in Ash Flat "some three years ago."   However, after being interviewed, Collins was eliminated as a suspect because, according to one investigator, his story did not match the crime scene.   It appears from the record that, despite having suspects, police neither arrested nor charged anyone in connection with the murders until much later.

In spring 2001, David Huffmaster of the Sharp County Sheriff's Department began to review the case file on the Wattses' murders after being contacted by Kathy Watts's sister, Chris Lindner, at a school function.   In spring 2002, Huffmaster essentially reopened the case and, over the course of the next few years, conducted interviews of some of the persons previously interviewed and involved in the original investigation.   Huffmaster's interviews of both Belinda Stewart, who had been married to Wertz at the time of the crimes, but had since divorced him and remarried, and Jamie Snyder, Jr., yielded statements that led to an arrest warrant being issued for Wertz on April 27, 2006.   On April 28, 2006, a felony information was filed, charging Wertz with two counts of capital murder. He was tried by a jury, was convicted, and as already stated, was sentenced to death.

*Wertz v. State*, 374 Ark. 256, 258-59, 287 S.W.3d 528, 530 (2008), *mandate recalled by* 2016 Ark.

249, 493 S.W.3d 772.

Mr. Wertz filed a petition for postconviction relief pursuant to Arkansas Rule of Criminal

Procedure 37.5, alleging he received ineffective assistance of counsel at trial and setting forth

twenty-two specific allegations of deficient performance.   (Doc. No. 12-14 at 26-46.)   The trial

court denied the petition after a hearing,[2] and the Arkansas Supreme Court affirmed.   *Wertz v.*

*State*, 2014 Ark. 240, 434 S.W.3d 895.   Mr. Wertz subsequently filed a motion to recall the direct-

---

[2] I note that, at the hearing on Mr. Wertz's Rule 37 petition, his trial counsel, Greg Bryant, testified about records of Mr. Wertz's military service.   (Doc. No. 12-15 at 212-28.)   In the course of that testimony, Bryant said he spoke to me about certain military commendations.   (*Id*. at 218.)   He did not testify that he spoke to me about Mr. Wertz or his case, and I have no recollection of speaking with him about Mr. Wertz or his case.   In fact, I have no recollection at all of the conversation, which would have occurred over a decade ago.   According to Bryant's testimony, our conversation was about military commendations generally:   "My conversation with Mr. Volpe was limited to what are – what are the requirements – what is the history behind the Distinguished Service Medal."   (*Id*. at 222.)

appeal mandate, arguing the Arkansas Supreme Court's failure to raise the issue of the trial court's submission of a single set of penalty-phase verdict forms, following his conviction on two counts of capital murder, constituted a defect or breakdown in the appellate process.   (Doc. No. 12-23.) The Arkansas Supreme Court agreed, holding "the submission of a single set of verdict forms deprived the jury of the opportunity to separately consider the circumstances surrounding each of the murders in determining the punishment to be assessed for each count" and thus deprived Mr. Wertz of the individualized sentencing required under the Eighth and Fourteenth Amendments. *Wertz v. State*, 2016 Ark. 249, at 7, 493 S.W.3d 772, 776.   The court reversed Mr. Wertz's death sentence and remanded for resentencing on both counts.   *Id*.   On remand, the trial court imposed a sentence of life imprisonment without the possibility of parole.   (Doc. No. 12-29.)

In his Petition for Writ of Habeas Corpus, Mr. Wertz lists fourteen claims for relief, including that he is actually innocent of the murders, his trial proceedings were unconstitutional in a variety of ways, and he received ineffective assistance of counsel at trial, on appeal, and in the Rule 37 proceedings.   (Doc. No. 1.)   In accordance with Rule 6 of the Rules Governing Section 2254 Cases in the United States District Courts, I authorized Mr. Wertz to conduct discovery pertaining to specified matters.   (Doc. No. 29.)   After careful consideration of Mr. Wertz's Petition and the results of the discovery (Doc. Nos. 30, 34), the Response to the Petition (Doc. No. 12), and Mr. Wertz's Reply (Doc. No. 17), I recommend the Petition be dismissed with prejudice.

## II.    ANALYSIS

### A.    Procedural Default

As an initial matter, I note Respondent's contention that many of Mr. Wertz's claims are procedurally defaulted.   Before filing a federal habeas petition, a state inmate must first "fairly present" the substance of his or her federal habeas claims to the appropriate state courts and exhaust

4

all available state remedies. *Murphy v. King*, 652 F.3d 845, 848-49 (8th Cir. 2011) (citing *Baldwin v. Reese*, 541 U.S. 27, 29 (2004); 28 U.S.C. § 2254(b)(1) ("An application for a writ of habeas corpus . . . shall not be granted unless it appears that the applicant has exhausted the remedies available in the courts of the State")).   When a state inmate fails to comply with the fair-presentment requirement, his or her claim will be procedurally defaulted. *Murphy*, 652 F.3d at 849.   Moreover, if it would be futile for a petitioner to return to the state courts to present his or her claim, "the exhaustion requirement in § 2254(b) is satisfied, but th[is] failure to exhaust 'provides an independent and adequate state-law ground for the conviction and sentence, and thus prevents federal habeas corpus review of the defaulted claim.'" *Armstrong v. Iowa*, 418 F.3d 924, 926 (8th Cir. 2005) (quoting *Gray v. Netherland*, 518 U.S. 152, 162 (1996)).   When a state prisoner has defaulted his or her federal claims in state court, federal habeas review of the claims is barred unless the prisoner can demonstrate:   (1) "cause for the default and actual prejudice as a result of the alleged violation of federal law"; or (2) "that failure to consider the claims will result in a fundamental miscarriage of justice," that is, a constitutional violation has resulted in the conviction and continued incarceration of one who is actually innocent. *Coleman v. Thompson*, 501 U.S. 722, 750 (1991).

The law of procedural default notwithstanding, there are occasions to bypass it. "Although the procedural bar issue should ordinarily be resolved first, judicial economy sometimes dictates reaching the merits if the merits are easily resolvable against a petitioner while the procedural bar issues are complicated." *Barrett v. Acevedo*, 169 F.3d 1155, 1162 (8th Cir. 1999). Procedural default does not constitute a jurisdictional bar to review. *Trussell v. Bowersox*, 447 F.3d 588, 590 (8th Cir. 2006).   Therefore, where the procedural default question is difficult and the petitioner cannot prevail on the merits, there is "no reason to belabor this issue." *Barrett*, 169

F.3d at 1162.   "The simplest way to decide a case is often the best."   *Chambers v. Bowersox*, 157 F.3d 560, 564 n. 4 (8th Cir. 1998).

Mr. Wertz's Petition lists fourteen claims for relief, several of which are broken down into many sub-claims.   (Doc. No. 1 at 3-4.)   Respondent contends most are defaulted for various reasons, and Mr. Wertz submits the default is excused for various reasons, summarizing the procedural arguments in a five-page chart.   (Doc. No. 17 at 70-75.)   It goes without saying that the procedural bar issues in this case are complicated.   For that reason and because I find the merits are easily resolvable against Mr. Wertz, a deviation from the usual course is in order.   In the interest of judicial economy, I recommend proceeding to the merits of Mr. Wertz's claims and do so below.

### B.    Actual Innocence

Mr. Wertz contends his convictions violate the Eighth and Fourteenth Amendments because he is actually innocent of the murders.   (Doc. No. 1 at 10.)   The crux of his argument is that the State's case was based almost entirely on the testimony of his alleged accomplice, Jamie Snyder, Jr., and Mr. Wertz's ex-wife, Belinda Stewart, which was not corroborated by any physical evidence.   (*Id.*)

As Respondent points out, the United States Supreme Court has not resolved whether a prisoner may be entitled to habeas relief based on a freestanding claim of actual innocence. *McQuiggin v. Perkins*, 569 U.S. 383, 392 (2013).   "Claims of actual innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding." *Herrera v. Collins*, 506 U.S. 390, 400 (1993); *see also Burton v. Dormire*, 295 F.3d 839, 848 (8th Cir. 2002) ("[W]e have squarely rejected the notion that a prisoner may receive a writ simply

because he claims he is innocent.").   On the other hand, a credible showing of actual innocence may allow a prisoner to pursue constitutional claims on the merits notwithstanding the existence of a procedural bar to relief.   *McQuiggin*, 569 U.S. at 392.   A petitioner who raises a "gateway" claim of actual innocence must establish (1) new and reliable evidence that was not presented at trial, and (2) in light of the new evidence, it is more likely than not that no reasonable juror would have convicted him.   *Weeks v. Bowersox*, 119 F.3d 1342, 1351 (8th Cir. 1997).   Evidence is "new" if it was not available at the time of trial through the exercise of due diligence.   *Nooner v. Hobbs,* 689 F.3d 921, 934 (8th Cir. 2012).   Additionally, to establish a claim of actual innocence, the petitioner must show factual innocence, not simply legal insufficiency of the evidence to support a conviction.   *McNeal v. United States*, 249 F.3d 747, 749 (8th Cir. 2001).

The United States Supreme Court has made clear that the threshold for a freestanding claim of actual innocence, if it were recognized, would be even higher than the threshold for a gateway claim.   "[T]he threshold showing for such an assumed right would necessarily be extraordinarily high."   *Herrera*, 506 U.S. at 417.

> The threshold, if it exists, would require "more convincing proof" than the "gateway" standard that allows for consideration of otherwise defaulted constitutional claims upon a showing of actual innocence.   Thus, on a freestanding claim of actual innocence, it is not sufficient that a petitioner shows even that it is "more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt."   The "extraordinarily high" threshold, if recognized, would be even higher.

*Dansby v. Hobbs*, 766 F.3d 809, 816 (8th Cir. 2014) (internal citations omitted).   Mr. Wertz has not met this threshold.

First, Mr. Wertz has not presented any new and reliable evidence that was not presented at trial.   As previously noted, I authorized limited discovery under Rule 6 of the Rules Governing Section 2254 Cases in the United States District Courts.   Specifically, I allowed Mr. Wertz to

7

subpoena the telephone records of Kay Snyder, the mother of Jamie Snyder, Jr.   (Doc. No. 29 at 2.)   The records were meant to corroborate her trial testimony that she had received a call from her son around midnight on the night of the murders, that the call came from Mr. Wertz's house, and that she was able to hear Mr. Wertz in the background – testimony that boosted Mr. Wertz's alibi of having been home all night with Snyder.   (Doc. No. 18 at 4.)   However, the telephone records turned out not to exist "due to retention standards."   (Doc. Nos. 30 at 1, 30-2 at 1.)

I also allowed Mr. Wertz to pursue additional DNA testing.   (Doc. No. 29 at 2.)   The physical evidence tested included the following:   (1) tape lifts from the front door and a bedroom door of the Watts home, which were taken by the Arkansas State Crime Laboratory in 2005 but never analyzed; (2) a piece of wood from the front door jamb and another piece of wood found near the door, both of which had blood on them and were tested in 1987 using a serology analysis that could not generate a conclusive profile; and (3) a piece of glass from the front porch which did not contain a sufficient amount of blood to generate a conclusive profile in 1987 and which was resubmitted for testing in 2005, although no results were reported.   (Doc. No. 18 at 5-6.)   But according to the April 2019 report of the crime lab, none of these items contained "a sufficient amount of DNA for further processing."[3]   (Doc. No. 34 at 1, 5.)

Second, Mr. Wertz cannot show that it is more likely than not that no reasonable juror would have convicted him, to say nothing of the "more convincing proof" required for a freestanding actual-innocence claim.   *See Dansby*, 766 F.3d at 816.   As Respondent points out, the Arkansas Supreme Court's holding on direct appeal that sufficient evidence supported Mr.

---

[3] Mr. Wertz notes the Sharp County Sheriff's Office sent two envelopes purportedly containing tape lifts to the crime lab in response to my Order, one of which the crime lab apparently found to be empty.   (Doc. No. 34 at 2.)   Additionally, the crime lab report does not mention or contain any results for a tape lift from the bedroom door.   (*Id*. at 2, 5.)   However, Mr. Wertz acknowledges that he is not aware of any more tape lifts available to be tested.   (*Id*. at 3.)

Wertz's convictions is due deference.   Under the Antiterrorism and Effective Death Penalty Act of 1996, and in the interests of finality and federalism, federal habeas courts are restricted to a "limited and deferential review of underlying state court decisions."   *Sera v. Norris*, 400 F.3d 538, 542 (8th Cir. 2005); *Ryan v. Clarke*, 387 F.3d 785, 790 (8th Cir. 2004).   Mr. Wertz argues the standard of deferential review does not apply because his actual-innocence claim was not adjudicated on the merits in state court.   More specifically, he contends his claim of actual innocence on habeas is not the same as the challenge to the sufficiency of the evidence he raised on direct appeal.   (Doc. No. 17 at 7-8, 57-58.)   But the Arkansas Supreme Court treats the two as one and the same:   claims of actual innocence "are effectively challenges to the sufficiency of the evidence."   *Clay v. Kelley*, 2017 Ark. 294, at 3, 528 S.W.3d 836, 838.   Furthermore, Mr. Wertz's argument in support of his habeas claim mirrors the argument he made on direct appeal – namely, that the accomplice testimony contained several inconsistences and was not sufficiently corroborated.   *See Wertz*, 374 Ark. at 259-64, 287 S.W.3d at 530-34.   Accordingly, a limited and deferential review is appropriate.   *See Dansby*, 766 F.3d at 817-18 (applying deferential standard of § 2254(d) to review of state court decision addressing sufficiency of the evidence).

Federal courts may not grant habeas relief on a claim that was adjudicated on the merits in state court unless the adjudication of the claim

> (1)     resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2)     resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); *see also Rompilla v. Beard*, 545 U.S. 374, 380 (2005).   Under subsection (d)(1), a state court decision is "contrary to" federal law if the state court arrives "at a conclusion opposite to that reached by [the United States Supreme Court] on a question of law or if the state

court decides a case differently than [the United States Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000); *see also Collier v. Norris*, 485 F.3d 415, 421 (8th Cir. 2007).   A state court decision involves an "unreasonable application" of federal law when the state court "identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Williams*, 529 U.S. at 413.   Under subsection (d)(2), a state court decision is based on an "unreasonable determination of the facts" "only if it is shown by clear and convincing evidence that the state court's presumptively correct factual findings do not enjoy support in the record." *Lomholt v. Iowa*, 327 F.3d 748, 752 (8th Cir. 2003); *see also* 28 U.S.C. § 2254(e)(1) (a state court's factual finding shall be presumed to be correct, and the applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence); *Smulls v. Roper*, 535 F.3d 853, 861-62 (8th Cir. 2008) (applying § 2254(e)(1)'s presumption to a state trial court's findings).

Here, the Arkansas Supreme Court's conclusion with respect to the sufficiency of the evidence was neither contrary to nor an unreasonable application of federal law, nor was it based on an unreasonable determination of the facts.   The court outlined Snyder's testimony as follows:

> Snyder testified that on the day of the murders, he received a phone call from Wertz, during which Wertz told him that he needed "some help with the matter of Terry Watts."   After meeting Wertz at the armory to turn in some National Guard gear, Snyder and Wertz went to Wertz's home, arriving between 4:00 and 4:30 p.m.   Snyder stated that, while there, Wertz retrieved a shotgun from his home and put it in Snyder's mother's car, which Snyder was driving.   They then left Wertz's home.   Driving toward Guthrie, Oklahoma, where some of Terry Watts's relatives lived, Wertz told Snyder that he expected Terry Watts to be at the Guthrie home.   According to Snyder, Wertz further explained that there would likely be five to eight people at the home, including children, and that "anyone over eight would need to be eliminated as a possible witness."   When Snyder conveyed his concerns about "including anybody else, especially children[,]" Wertz told him that he "would take care of the children and that we would not abort and that I didn't want to make myself expendable."   Upon driving down a road in Guthrie, Wertz

10

told Snyder that "they" were not there and that he and Snyder "would head over to Arkansas." They did so, and during the trip, Wertz told Snyder that if they encountered any "law enforcement interference[,]" they "would abort the mission."

Upon arriving in Ash Flat near midnight, Snyder testified that he and Wertz exited the car, taking shotguns, and approached the front door of the home by its porch. He said that Wertz had him knock on the door, which Snyder did. Snyder stated that a male came to the door, looked out, and began to open the door, when Wertz stepped forward. At that time, the male, whom Snyder assumed was Terry Watts, slammed the door closed and yelled "Steve." At that time, according to Snyder, Wertz fired his shotgun, and Snyder quickly turned to leave. Snyder stated that he believed that Wertz then kicked the door and entered the house. While standing beside the front porch, Snyder heard two or three more shots.

Snyder testified that, as Wertz came out of the house after being inside for no more than five minutes, Snyder returned to the car. He stated that when Wertz entered the passenger's side of the car, he was laughing and said that "Kathy Watts had a nice body" or "words to that effect." Snyder said that he turned the car around and exited the property. After Snyder made a wrong turn, Wertz took over driving. Snyder testified that, during their return trip, Wertz told him: "[I]f there were any questions, we had spent the night at the – at his residence in Cushing. And that he had been ill as if with the flu. And that he would go to Tinker Air Force Base on sick call upon our return to give credibility to the alibi." Snyder said that they returned to Wertz's home "in the area of 7:00" the morning of December 31.

*Wertz*, 374 Ark. at 260-61, 287 S.W.3d at 532.[4] The court held Snyder's testimony was

corroborated by that of other witnesses, including Belinda Stewart, who was married to Mr. Wertz

at the time of the murders. The court summarized her testimony as follows:

She testified that, during the time she had her daughter for visitation after Christmas of 1986, Wertz told her daughter several times that she would not have to go back to her father's. Belinda further testified that on December 30, she saw her husband and Snyder at her house around 4:00 or 4:30 p.m. She said that after 4:30 p.m., she did not see Wertz the rest of the day. She said that the next time she saw him was early the next morning, as the sun was starting to rise. She further testified, "He just said that if anybody asked that he was home the whole night and that he was at the Armory through – during the day time." She said that when Wertz left the house at 4:00 p.m. the day of the murders, he took a bag with him. She further

---

[4] Mr. Wertz and Snyder were both employed by the Oklahoma National Guard. Mr. Wertz lived in Cushing, Oklahoma, at the time of the murders.

stated that while they had several guns in their home in a closet, she noticed that a
little shotgun was missing.

*Id*. at 262, 287 S.W.3d at 533.   Additionally, the court pointed to evidence presented at trial that

Mr. Wertz had threatened Terry Watts on several occasions:

> Jeffery Birt testified that about one week prior to December 18, 1986, he heard
> Wertz say, "[W]e did it their way.   Now we are going to do it my way."   Birt
> observed that Wertz was complaining about the cost of the custody matter, that
> things were not going his way, and that it was time to do it his way.   John Watts
> testified that, in July 1986, he went with Terry Watts to pick up his daughter from
> the Wertzes' home.   He stated that as they were leaving, Wertz said, "[I]t was a
> long way back to Arkansas."   Finally, Tom Garner, the attorney who aided Terry
> Watts with his custody matter, testified that at some time in December 1986, Terry
> came to him and told him that he wanted to make a will.   Garner said that Terry
> told him he wanted to get his affairs in order in case something happened to him
> because, after his last custody hearing, Wertz told Terry "he was a dead man."

*Id*. (footnote omitted).   The Arkansas Supreme Court determined this evidence sufficiently

corroborated Snyder's testimony as it connected, to a substantial degree, Mr. Wertz to the murders.

This conclusion is not in conflict with federal law, which defines the "critical inquiry" on review

of the sufficiency of the evidence to support a state court conviction as whether, after viewing the

evidence in the light most favorable to the prosecution, "*any* rational trier of fact could have found

the essential elements of the crime beyond a reasonable doubt."   *Jackson v. Virginia*, 443 U.S.

307, 318-19 (1979) (emphasis in original).

As he did on direct appeal, Mr. Wertz challenges the sufficiency of the accomplice

testimony and corroborating evidence by pointing to various discrepancies.   He points out that

both Snyder and Stewart gave multiple statements over the years as the murders were being

investigated and both changed elements of their accounts over time, creating inconsistencies

regarding the alibi, the travel from Cushing to Ash Flat, and the missing gun.   As the Arkansas

Supreme Court pointed out on direct appeal, questions of conflicting testimony and inconsistent

evidence were not for it to resolve.   *Wertz*, 374 Ark. at 263, 287 S.W.3d at 534.   The same is true

on federal habeas review.   The requirement that all of the evidence be considered in the light most favorable to the prosecution "gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts."   *Jackson*, 443 U.S. at 319.

Mr. Wertz also takes issue with the lack of physical evidence connecting him to the murders.   In addition to the items previously mentioned – which were subjected to further DNA testing, with no conclusive results – Mr. Wertz points to a Caucasian head hair found at the scene and a boot print found on the door of the Watts home.   The hair was tested in 1987 but, according to the crime lab, was too limited in microscopic characteristics for any comparison value.   The hair is now apparently lost.   The State introduced the boot print at trial to show it was similar to the boots used by the Oklahoma National Guard, where Mr. Wertz was employed.   The defense rebutted this evidence by indicating the boot print was too small to have been left by Mr. Wertz. Regardless, any complaint about the lack of physical evidence connecting Mr. Wertz to the murders is easily dispensed with.   Corroborating evidence may be circumstantial so long as it is substantial.   *See, e.g.*, *Tucker v. State*, 2011 Ark. 144, at 4, 381 S.W.3d 1, 4.   And, in any event, Mr. Wertz cannot reach the threshold of an actual-innocence claim by pointing out an absence of physical evidence.   The standard requires him to come forward with some new, reliable evidence that, at the very least, makes it more likely than not that no reasonable juror would have convicted him.   This he has failed to do.

In short, Mr. Wertz has simply not come close to the "extraordinarily high" threshold for a freestanding actual-innocence claim.   *Herrera*, 506 U.S. at 417.   He has not produced any new evidence and relies only on the supposed weaknesses of the State's case that he has challenged all along, claiming the accomplice testimony was unreliable and insufficiently corroborated.   The

Arkansas Supreme Court rejected these arguments; its decision was not contrary to or an unreasonable application of federal law, nor was it based on an unreasonable determination of the facts.   As that court concluded, Snyder's testimony was corroborated by Stewart, who testified that Mr. Wertz had promised her daughter she would not have to return to her father's house, that he was not home on the night of the murders, that he instructed her to lie about his whereabouts, and that a gun was missing from their home.   Testimony regarding the threats Mr. Wertz had made to Terry Watts further corroborated the accomplice testimony.   For these reasons, Mr. Wertz's claim of actual innocence fails on the merits.

C.   **Hearing Loss**

Mr. Wertz claims he was unable to hear during the trial, as he suffered major hearing loss and his hearing aids had been lost when he was transported to Arkansas from Florida, where he lived at the time of his arrest.   (Doc. No. 1 at 27.)   As Mr. Wertz points out, he informed the court of his hearing loss prior to trial and said he could "lip read a little" if people faced him when speaking and enunciated clearly.   (Doc. No. 12-5 at 41.)   The trial judge instructed him to raise the issue during trial if he could not hear something and the judge would "take care of that."   (*Id.*)   Mr. Wertz says he could not hear throughout the trial, which left him unable to comprehend the proceedings, assist in his defense, or confront the witnesses against him, rendering him "functionally absent" from the trial.   (Doc. No. 1 at 28.)

Respondent points to an instructive case from the United States Court of Appeals for the Second Circuit, *United States v. Crandall*, 748 F.3d 476 (2d Cir. 2014).   There, the court held the Sixth Amendment right to participate in one's own trial encompasses the right to reasonable accommodations for hearing impairments.   748 F.3d at 481; *see also United States v. Ponzo*, 853 F.3d 558 (1st Cir. 2017) (citing *Crandall*).   But that right is "limited to those reasonable

accommodations that are requested by the defendant before or during trial, or the need for which is, or should reasonably be, clear or obvious to the district judge."  *Id*. (citing *Valladares v. United States*, 871 F.2d 1564, 1566 (11th Cir. 1989)).   The Sixth Amendment "does not create an absolute right to the elimination of all difficulties or impairments that may hinder a criminal defendant's capacity to perfectly comprehend, and participate in, court proceedings."  *Id*. (citing *McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548, 553 (1984) (a litigant is entitled to a fair trial but not a perfect one, as there are no perfect trials)).

Although Mr. Wertz claims to have complained to his lawyer throughout the trial, the trial record does not contain any other mention of his inability to hear.   Neither he nor his counsel requested an accommodation during the trial, despite having been told to alert the judge if he could not hear.   "Having failed to notify the Judge of a continuous inability to hear the proceedings," Mr. Wertz was only entitled to accommodations "insofar as his impairment was, or reasonably should have been, clear or obvious" to the trial judge.   *Id*. at 482-83.   The degree of accommodations required varies from case to case on a "sliding scale, depending on the degree of severity of the impairment."  *Id*. at 484.   As in *Crandall*, the trial judge knew that Mr. Wertz had *some* difficulty hearing at times.   Mr. Wertz indicated he could mitigate the problem with lip reading, and he never complained that witnesses or other speakers were not facing him or enunciating clearly enough for him to lip read.   Thus, he has failed to establish he was entitled to any special accommodations, and he has not shown his convictions were obtained in violation of his Sixth Amendment rights.   *See Valladares*, 871 F.2d at 1566 ("To allow a defendant to remain silent throughout the trial and then, upon being found guilty, to assert a claim of inadequate [language] translation would be an open invitation to abuse.").

D.     **Trial Counsel's Conflict of Interest**

Mr. Wertz claims his trial counsel, Greg Bryant, behaved in an "inappropriate sexual manner" toward Mr. Wertz's wife, Judith Wertz, while working on the case.   (Doc. No. 1 at 29.) He points to two emails Bryant sent to Judith Wertz after the trial concluded.   When Judith Wertz emailed Bryant to ask if he would remain on the case for the appeal, Bryant responded with an email addressing her as "Sunshine" and stating as follows:   "Don't ever ask me again if I am still willing to be involved in this case.   If you do I am going to fly down there and do something sick, disgusting and perverted to you."  (*Id*. at 31.)   On another occasion, Judith Wertz emailed Bryant to ask if he was still speaking to her after she sent him a "snippy" email.  (*Id*.)   In response, Bryant stated in part:  "You know I love you, so I'm not worried [about] a 'snippy' letter that really wasn't snippy."   (*Id*.)   According to Mr. Wertz, this behavior constituted a breach of Bryant's duty of loyalty and also motivated him to remain on the case although the Wertzes could not afford to pay him enough to fund an appropriate defense.   (*Id*. at 32.)   For her part, Judith Wertz, who is still married to Mr. Wertz, has submitted a letter meant to clarify her relationship with Bryant.   (Doc. No. 3.)   She maintains there was no inappropriate relationship but describes the two emails at issue as inappropriate.   (*Id*. at 3-5.)

Mr. Wertz contends he need not make a showing of prejudice in order to succeed on this claim.   (Doc. No. 1 at 32.)   He is correct that prejudice is presumed in certain Sixth Amendment contexts.  *Strickland v. Washington*, 466 U.S. 668, 692 (1984).   Specifically, "[a]ctual or constructive denial of the assistance of counsel altogether" and "various kinds of state interference with counsel's assistance" are legally presumed to result in prejudice.  *Id*.   In *Cuyler v. Sullivan*, 446 U.S. 335, 348-50 (1980), which predated *Strickland*, the Supreme Court identified another instance when prejudice may be presumed:   when counsel is burdened by an actual conflict of interest.   But this presumption is more limited:

> In those circumstances, counsel breaches the duty of loyalty, perhaps the most basic of counsel's duties.   Moreover, it is difficult to measure the precise effect on the defense of representation corrupted by conflicting interests.   Given the obligation of counsel to avoid conflicts of interest and the ability of trial courts to make early inquiry in certain situations likely to give rise to conflicts, *see*, *e.g.*, Fed. Rule Crim. Proc. 44(c), it is reasonable for the criminal justice system to maintain a fairly rigid rule of presumed prejudice for conflicts of interest.   Even so, the rule is not quite the per se rule of prejudice that exists for the Sixth Amendment claims mentioned above.   Prejudice is presumed only if the defendant demonstrates that counsel "actively represented conflicting interests" and that "an actual conflict of interest adversely affected his lawyer's performance."   *Cuyler v. Sullivan*, *supra*, 446 U.S., at 350, 348, 100 S.Ct., at 1719, 1718 (footnote omitted).

*Strickland*, 466 U.S. at 692.   Moreover, the Supreme Court "has never applied *Cuyler*'s rule of presumed prejudice outside the context of multiple representation of codefendants or serial defendants."   *Caban v. United States*, 281 F.3d 778, 782 (8th Cir. 2002).

Even if *Cuyler*'s rule of presumed prejudice were applicable here, Mr. Wertz's claim is simply too tenuous to meet his burden of showing Bryant actively represented conflicting interests. The emails to Mr. Wertz's wife, while certainly inappropriate, are too vague to establish what Mr. Wertz suggests.   Although the language is concerning, the emails do not show "unambiguous lust," as Mr. Wertz says.   (Doc. No. 17 at 23.)   Nor can he demonstrate that an actual conflict of interest adversely affected Bryant's performance.   Even if Bryant had performed deficiently by remaining on the case despite the Wertzes' inability to fund an adequate defense, Mr. Wertz has not shown his performance was in any way related to an inappropriate relationship with Judith Wertz.   The possibility of a conflict of interest is not enough to impugn a criminal conviction. *Cuyler*, 446 U.S. at 350.   Accordingly, Mr. Wertz is not entitled to relief on this claim.

E.    **Ineffective Assistance of Counsel at Trial**

Mr. Wertz alleges he was denied his Sixth Amendment right to effective assistance of counsel at trial.   (Doc. No. 1 at 32.)   Under *Strickland v. Washington*, a claim of ineffective assistance of counsel has two components:   (1) that counsel's performance was deficient, resulting

in errors so serious that counsel was not functioning as the counsel guaranteed by the Sixth Amendment; and (2) that the deficient performance prejudiced the defense, depriving the defendant of a fair trial.  466 U.S. at 687.  The deficient-performance component requires that a defendant show counsel's representation fell below an objective standard of reasonableness.  *Id*. at 687-88.  The prejudice component requires that a defendant establish a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Id*. at 694.  A reasonable probability is a probability sufficient to undermine confidence in the outcome.  *Id*.  Unless a defendant makes both showings, it cannot be said that the conviction resulted from a breakdown in the adversary process that renders the result unreliable.  *Id*. at 687.

Judicial scrutiny of counsel's performance must be highly deferential.  *Id*. at 689.  A court must indulge a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'"  *Id*. (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)).

## 1.    Unprofessional Sexual Behavior

First, Mr. Wertz claims Bryant's "inappropriate sexual conduct" toward Judith Wertz rendered his performance objectively unreasonable.  (Doc. No. 1 at 33.)  He says Bryant's "devotion" to Judith Wertz prejudiced him because it prevented Bryant from presenting an adequate defense.  (*Id*.)  Mr. Wertz's claim fails under the *Strickland* standard for the same reasons it fails under the *Cuyler* standard.  The emails are too vague to establish an actual conflict of interest or breach of Bryant's duty of loyalty.  Even if there were clear evidence of behavior that fell below an objective standard of reasonableness, Mr. Wertz cannot demonstrate prejudice. He cannot establish a connection between Bryant's supposed relationship with Judith Wertz and

18

his performance in the case; therefore, he cannot demonstrate a reasonable probability that the result would have been different absent any inappropriate relationship.

### 2.    Failure to Procure Co-Counsel and Adequate Funds

Mr. Wertz next claims Bryant performed deficiently by trying the case alone and with insufficient funds.   (Doc. No. 1 at 33.)   He notes Bryant did not reach a formal fee arrangement with Mr. Wertz or his family, instead relying on a verbal promise from Mr. Wertz's father that he would fund up to $100,000 of the defense.   (*Id*.)   Additionally, Bryant told Judith Wertz at the outset that he "envisioned" hiring attorney Jeff Rosenzweig to work as co-counsel and focus on sentencing.   (*Id*.)   But Rosenzweig never joined Mr. Wertz's legal team, and Mr. Wertz's father disinherited him before he died, having provided approximately half of the promised $100,000. (*Id*. at 33-35.)   Subsequently, Judith Wertz provided another $43,000 for the defense.   (*Id*. at 34-35.)   According to Mr. Wertz, Bryant should have advised him to seek a declaration of indigence and an appointed defense team.   (*Id*. at 34, 36.)

Mr. Wertz has not shown that Bryant's continued representation fell below an objective standard of reasonableness.   First, although Mr. Wertz faults Bryant for trying the case alone, the record shows he had the assistance of both an associate attorney and a fact investigator in his preparations for trial.   According to Bryant's testimony at the Rule 37 hearing, the fact investigator was involved in the case at the early stages, having traveled to Arkansas to attend the plea and arraignment, and did significant work on the case through trial.   (Doc. No. 12-15 at 23-24, 160.)   Additionally, Bryant testified that Rosenzweig's proposed role was to aid in mitigation. (*Id*. at 33.)   Because Mr. Wertz is no longer facing a death sentence, he cannot demonstrate prejudice resulting from the absence of a mitigation specialist.

Mr. Wertz points to the American Bar Association Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases, which recommend no fewer than two attorneys in capital cases.   (Doc. No. 1 at 36.)   But these "are only guides."   *Strickland*, 466 U.S. at 688.   "No particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant."   *Id*. at 688-89.   Given Bryant's extensive experience trying capital cases (Doc. No. 12-15 at 16-17), his decision to try this case without another attorney of record – but with significant assistance from other sources – was not outside the wide range of reasonable professional assistance.

Moreover, Mr. Wertz cannot demonstrate Bryant was ineffective for failing to procure adequate funds to mount an appropriate defense.   Although Mr. Wertz's father disinherited him while trial preparations were underway, he had already provided approximately half of the promised $100,000, and Mr. Wertz's wife subsequently provided most of the other half. According to Bryant's testimony, an amount "in the range of $100,000" would cover all attorney and expert fees and services (Doc. No. 12-15 at 20-22), and he did in fact receive this amount from Mr. Wertz's family.   Mr. Wertz does not identify any specific resource he had to go without due to a lack of funds; therefore, he has failed to establish prejudice.[5]   He does say Bryant should have taken steps to procure state funding for an investigator (Doc. No. 1 at 36), but this presumes Mr. Wertz would have qualified for an indigency determination.   *See* Ark. Code Ann. § 16-87-212. Also, Bryant had already retained the services of an investigator, whose fee was paid by Mr.

___

[5] In his Reply, Mr. Wertz says additional funding would have allowed him to retain (1) a forensic pathologist to "cast doubt" on the State's time-of-death evidence and (2) an expert to establish the boot print on the door of the Watts home was too small to be his.   (Doc. No. 17 at 34.)   For reasons set out elsewhere in this recommended decision, testimony of this nature would not have instilled in the jury a reasonable doubt as to Mr. Wertz's guilt.

20

Wertz's father.   In short, Mr. Wertz's allegation that his defense was underfunded is conclusory and does not warrant relief.

### 3.    Failure to Address Hearing Loss

Mr. Wertz claims Bryant unreasonably failed to take action to ensure he could hear and understand the proceedings.   (Doc. No. 1 at 36.)   As previously stated, Mr. Wertz was not entitled to an accommodation during trial because he failed to request one and his need for an accommodation was not clear or obvious to the trial judge.   *See Crandall*, 748 F.3d at 482-83. Mr. Wertz attempts to fault Bryant for failing to request an accommodation on his behalf.   But even if Bryant's failure to seek an accommodation amounted to deficient performance, Mr. Wertz cannot demonstrate a reasonable probability that the result of the trial would have been different had his hearing loss been accommodated.

Mr. Wertz suggests the standard for prejudice should be lower in this instance.   (Doc. No. 17 at 34-35.)   Some courts have taken this approach, stating prejudice should be presumed when a defendant's effective absence from trial renders the trial fundamentally unfair.   *See, e.g.*, *Pierotti v. Harris*, 350 F. Supp. 3d 187, 197-98 (E.D.N.Y. Oct. 11, 2018) ("Here, there is a reasonable probability that Petitioner would have been entitled to accommodations.   Without accommodation, portions of the trial were, in effect, held in his absence giving rise to an unrebutted presumption of prejudice.").   But the record here simply does not support a finding that Mr. Wertz was functionally absent from his trial.   He informed the trial judge he had some difficulty hearing, he said he could mitigate the problem with lip reading, and the issue did not come up again.

Mr. Wertz raised this claim in his Rule 37 petition, and the trial court rejected it.   Mr. Wertz abandoned the issue on appeal of the denial of Rule 37 relief, but the trial court's decision is due deference.   *See Greene v. Fisher*, 565 U.S. 34, 39-40 (2011); *Worthington v. Roper*, 631

F.3d 487, 497 (8th Cir. 2011) (the AEDPA's standard of deferential review applies to the "last

reasoned decision" of the state courts).    On Mr. Wertz's claim that Bryant was ineffective for

failing to seek accommodations for his hearing loss, the trial court found as follows:

> The court finds this claim to be wholly without merit.   The court had a meeting
> with counsel and petitioner in chambers prior to trial.   During this discourse, the
> petitioner mentioned that he was hearing impaired.   The court instructed him that
> if he had any problems at any time, to bring it to the court's attention and the court
> would take care of it.   Petitioner did not bring this allegation to the court's
> attention.   The court finds no deficiency in representation of petitioner by defense
> counsel concerning this matter.

(Doc. No. 12-14 at 440-42) (internal record citation omitted).   This decision was neither contrary

to nor an unreasonable application of federal law, nor was it based on an unreasonable

determination of the facts.   In short, the trial judge was in the best position to say whether Mr.

Wertz's supposed need for an accommodation at trial was unreasonably ignored by Bryant.

### 4.    Failure to Pursue Venue Change

Mr. Wertz contends Bryant performed deficiently by failing to secure a change of venue,

given Sharp County's small population and the extensive media coverage of the Watts murders

both at the time they occurred and at the time of Mr. Wertz's arrest.   (Doc. No. 1 at 38.)   Mr.

Wertz asserts Bryant failed to file a properly supported change-of-venue motion and failed to

secure a ruling even after voir dire, when it was revealed that many potential jurors had seen media

reports about the case.   (*Id*. at 38-41.)

Without addressing Bryant's performance, this claim fails due to Mr. Wertz's inability to

demonstrate prejudice.   *See United States v. Lee*, 715 F.3d 215, 221 (8th Cir. 2013) (the court

need not address the performance prong if petitioner does not affirmatively prove prejudice).

"Those federal circuit courts of appeals to address *Strickland*'s prejudice inquiry, in the context of

counsel's alleged error in failing to file a motion for change of venue, have held that the defendant

must prove that there is a reasonable probability that the trial court would have granted a motion for change of venue if defense counsel had made such a motion."  *Velazquez-Ramirez v. Fayram*, Case No. C12-4065-MWB, 2014 WL 523810, at 16 (N.D. Iowa Feb. 7, 2014) (citing *Meeks v. Moore*, 216 F.3d 951, 961 (11th Cir. 2001); *Deiterman v. Kansas*, 291 Fed. App'x 153, 159 (10th Cir. 2008); *Tafoya v. Tansy*, 9 Fed. App'x 862, 871 (9th Cir. 2001)).   Under Arkansas law, a criminal case may be removed to another county when the minds of the inhabitants of the original county "are so prejudiced against the defendant that a fair and impartial trial cannot be had in that county."   Ark. Code Ann. § 16-88-201; *Taylor v. State*, 334 Ark. 339, 345, 974 S.W.2d 454, 458 (1998).  More specifically, "[t]here can be no error in the denial of a change of venue if an examination of the jury selection shows that an impartial jury was selected and that each juror stated he or she could give the defendant a fair trial and follow the instructions of the court." *Rankin v. State*, 329 Ark. 379, 396, 948 S.W.2d 397, 406 (1997).

Based on my review of the voir dire in this case, it is clear Mr. Wertz was tried by an impartial jury.   Five of the jurors who were seated represented that they knew nothing about the case prior to trial.   (Doc. No. 12-5 at 111-12, 183-84, Doc. No. 12-6 at 35.)   The other seven jurors, along with the two alternates, all agreed they could set aside anything they had heard about the case, consider the evidence impartially, and render a fair verdict.   (Doc. No. 12-5 at 55-56, 142, 238-39, Doc. No. 12-6 at 35, 75.)   As Respondent points out, qualified jurors need not be totally ignorant of the facts and issues involved.   *Murphy v. Florida*, 421 U.S. 794, 800 (1975). "It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court."   *Id.* (quoting *Irvin v. Dowd*, 366 U.S. 717, 723 (1961)).   The United States Court of Appeals for the Eighth Circuit made this clear in a case involving pretrial publicity that made many jurors aware of even some facts ultimately ruled inadmissible:   "After

extensive voir dire, all those ultimately seated stated that they could lay aside any impression gained from the media and decide the case solely on the evidence presented." *Snell v. Lockhart*, 14 F.3d 1289, 1295 (8th Cir. 1994). The same is true here, and Mr. Wertz therefore cannot demonstrate a reasonable probability that he would have been granted a change of venue even if Bryant had fully pursued such a request.

### 5.    Failure to Strike Juror

Mr. Wertz argues Bryant unreasonably failed to strike juror Ephraim May, either for cause or with a peremptory challenge, because May stated he was a "strong supporter" of the death penalty. (Doc. No. 1 at 41.) According to Mr. Wertz, had May been removed, his place would have been taken by the first alternate, who purportedly "does not believe there was enough evidence at trial to prove Wertz guilty." (*Id.*)

First, because Mr. Wertz is no longer facing a death sentence, he cannot demonstrate prejudice in Bryant's failure to remove a juror seen as too keen on the death penalty. Mr. Wertz suggests he would not have been found guilty at all had May been removed from the jury, but this assertion is unsupported by any evidence whatsoever. However, even assuming that were true, Mr. Wertz has not shown Bryant's failure to remove May constituted deficient performance. Under Arkansas law, a juror is acceptable, and need not be excused for cause, as long as he or she can decide the case based upon the evidence presented at trial. *See, e.g.*, *Remeta v. State*, 300 Ark. 92, 102, 777 S.W.2d 833, 839 (1989). The voir dire of this juror indicated he would "look at all the evidence" and "listen to the facts." (Doc. No. 12-6 at 67.) Furthermore, the use of peremptory challenges is largely a matter of trial strategy. *See, e.g.*, *Camargo v. State*, 346 Ark. 118, 124, 55 S.W.3d 255, 259 (2001). "Matters of trial strategy and tactics, even if arguably improvident, fall within the realm of counsel's professional judgment and are not grounds for a

24

finding of ineffective assistance of counsel." *Id*. at 124, 55 S.W.3d at 260.   As Respondent points

out, this juror had a military background.   (Doc. No. 12-6 at 64-65.)   Mr. Wertz's military service

was emphasized in his trial, and Bryant's desire to have another veteran on the jury would not have

been unreasonable.

### 6.       Failure to Life-Qualify Jury

Mr. Wertz says Bryant failed to "life-qualify" the jury by seeking to eliminate those jurors

who would be too likely to vote for death.   (Doc. No. 1 at 41.)   He suggests a reasonable

probability that he would not have been convicted by a jury that had been life-qualified.   (*Id*. at

42.)   As Respondent notes, though, Bryant did ask each potential juror whether he or she would

consider an alternative punishment to death in the event of a capital murder conviction.   Thus, the

jury was in fact "life-qualified" as Mr. Wertz describes it.

### 7.       Failure to Investigate and Present Evidence of Innocence

#### a.       DNA Evidence

Mr. Wertz contends Bryant performed deficiently by failing to request additional DNA

testing of several pieces of evidence "that would have excluded Wertz as the perpetrator or linked

someone else to the offense."   (Doc. No. 1 at 43.)   This evidence includes the tape lifts from the

doors of the Watts home, the piece of wood from the front door, and the bloody piece of glass,

which, as previously noted, were all retested pursuant to Mr. Wertz's discovery request in this

case.   Mr. Wertz says Bryant also should have located the hair from the crime scene that had since

been lost, or at least informed the jury of the fact that it was missing.[6]   (*Id*.)

---

[6] Mr. Wertz also says Bryant should have sought independent DNA testing of three beer cans
found outside the Wattses' home; however, he abandons this argument in his Reply, admitting
there was no prejudice resulting from Bryant's failure to investigate.   (Doc. No. 17 at 42.)

Pursuant to *Strickland*, "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." 466 U.S. at 691. With respect to the prejudice prong, "[t]he burden is on the petitioner to demonstrate what evidence his trial counsel could have discovered that would have helped his defense." *Otey v. Grammer*, 859 F.2d 575, 578 (8th Cir. 1988). Mr. Wertz claims additional DNA testing of the tape lifts, wood, and glass would have exonerated him, but it is now clear, after having submitted the evidence to the testing he sought, that is not the case. Accordingly, Mr. Wertz cannot demonstrate he was prejudiced by Bryant's failure to seek additional pretrial testing, even assuming that failure was unreasonable. As for the lost hair, Mr. Wertz acknowledges it would be a leap too far to require Bryant to have found evidence that was indisputably lost. (Doc. No. 17 at 41.) Assuming Bryant performed deficiently by failing to "highlight the conveniently missing physical evidence at trial" (*id*.), it is simply not probable that the jury would have found the missing hair compelling in light of the accomplice testimony and corroborating evidence. *Strickland* prejudice "requires a 'substantial,' not just 'conceivable,' likelihood of a different result." *Cullen v. Pinholster*, 563 U.S. 170, 189 (2011).

### b.    Boot Print

Mr. Wertz acknowledges Bryant attempted to rebut the State's evidence of the partial boot print found on the door of the Wattses' home by showing Mr. Wertz's foot was too big to have left the print. (Doc. No. 1 at 45.) He argues, however, that Bryant should have retained a forensic expert to testify on this point rather than making the point through "theatrics" – namely, by having Mr. Wertz remove his boots during trial and entering them into evidence. (*Id*. at 45-46.)

This claim is subject to deferential review under 28 U.S.C. § 2254(d), as the Arkansas Supreme Court addressed it on appeal from the denial of Rule 37 relief. *Wertz*, 2014 Ark. 240, at

9, 434 S.W.3d at 903.   The court found Bryant had successfully shown the boot print was too small to have been left by Mr. Wertz:   "At trial, during his cross-examination of Huffmaster, Wertz established that he wore a size 13 shoe and the footprint found was a size 9."  *Id*.   Mr. Wertz now claims this statement was incorrect and the Arkansas Supreme Court's decision was based on an unreasonable determination of the facts.   (Doc. No. 17 at 56.)   Having read the trial transcript closely, I disagree.

On direct examination, Arkansas State Police Investigator Steve Huddleston testified the boot print measured approximately "four inches in diameter."  (Doc. No. 12-7 at 65.)   Two photographic exhibits introduced by the State showed the sample boots obtained from the Oklahoma National Guard, where Mr. Wertz was employed, also measured approximately four inches across.   (Doc. No. 12-9 at 146-47.)   It is unclear from Investigator Huddleston's testimony whether the sample boots in the photographs were a size 9.5 (Doc. No. 12-7 at 68) or a size 11 (Doc. Nos. 12-8 at 252, 12-9 at 4).   Regardless, the State's evidence showed the boot print left on the Wattses' front door was similar in size to the sample boots.   When Bryant recalled Investigator Huddleston, he was able to establish that Mr. Wertz wore a size 13 – bigger than either a size 9.5 or a size 11.   He did so both by having Mr. Wertz remove his boots and by measuring Mr. Wertz's actual foot.   (Doc. No. 12-9 at 4-6.)   Bryant had Investigator Huddleston confirm that "[y]ou couldn't get his foot in a size eleven with butter."   (*Id*. at 7.)   Thus, Bryant was able to show that Mr. Wertz's foot was too big to have left the boot print, and the Arkansas Supreme Court's decision on this point was not "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."   28 U.S.C. § 2254(d)(2).

### c.    Alibi Evidence

Next, Mr. Wertz claims Bryant acted unreasonably by failing to obtain and present Kay Snyder's telephone bill, which would have corroborated her testimony that her son had called her from Mr. Wertz's house on the night of the murders.   (Doc. No. 1 at 46.)   As previously noted, I allowed Mr. Wertz to subpoena Kay Snyder's telephone records in discovery, resulting in a notice that the records were unavailable due to retention standards.   (Doc. No. 30-2 at 1.)   More specifically, the subpoena response indicates call records are only retained for up to eighteen months.   (*Id.*)   Accordingly, the records would have been unavailable even if Bryant had tried to obtain them in preparation for trial, and Mr. Wertz cannot demonstrate prejudice.

### d.    Alternative Suspects

Mr. Wertz claims Bryant was ineffective for failing to investigate several leads authorities pursued in their initial investigation.   (Doc. No. 1 at 46.)   He claims Bryant should have looked into these alternative theories and also should have cross-examined Detective Huffmaster and Sheriff Dale Weaver about their failure to do so when they reopened the investigation in the early 2000s.   (*Id.* at 46-47.)

Mr. Wertz raised this claim in his Rule 37 petition and the trial court rejected it, finding the argument conclusory absent any evidence the investigations would have yielded the information Mr. Wertz suggested.   (Doc. No. 12-14 at 442.)   That decision is subject to deferential review under 28 U.S.C. § 2254(d).   Mr. Wertz cannot show the decision was contrary to or an unreasonable application of federal law, or that it was based on an unreasonable determination of the facts.   He acknowledges Bryant did investigate the most promising of the alternative suspects, Glenn Collins, the inmate who wrote a letter confessing to the murders and subsequently retracted his confession.   (Doc. No. 1 at 47.)   Nonetheless, Mr. Wertz claims Bryant should have investigated other theories, including that the Wattses were killed by a drug dealer for

28

whom Terry worked, by a person with whom Terry had argued at a party on the night of the murders, or by an unidentified person who intended to kill someone else.   (*Id*. at 14-16.)   But Mr. Wertz has no evidence these investigations would have been worth Bryant's time.   These were leads developed by the original investigators in 1986, and circumstances had changed by the time the investigation was reopened in the early 2000s and by the time Mr. Wertz was charged – and Bryant was hired – in 2006.   "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation."   *Strickland*, 466 U.S. at 690-91.

Furthermore, as Respondent points out, evidence tending to show that someone other than a defendant committed the crime charged is inadmissible under Arkansas law "unless it points directly to the guilt of the third party."   *Walker v. State*, 353 Ark. 12, 16, 110 S.W.3d 752, 755 (2003).   The evidence that Mr. Wertz suggests Bryant would have found had he done a more complete investigation is "evidence of mere motive or opportunity to commit the crime in another person" and "does no more than create an inference or conjecture as to another's guilt."   *Id*. Accordingly, it likely would have been inadmissible at trial, through cross-examination of Huffmaster and Weaver or otherwise.

### 8.    Failure to Challenge State's Time-of-Death Theory

Mr. Wertz asserts Bryant failed to properly challenge the State's theory as to the time of death, a critical question given Jamie Snyder, Jr.'s testimony that he and Mr. Wertz had driven from Oklahoma to Arkansas and back on the night of the murders.   (Doc. No. 1 at 47.)   The State introduced the testimony of Dr. Charles Kokes, Chief Medical Examiner at the Arkansas State Crime Laboratory, who stated he reviewed photographs from the crime scene and autopsies to

assess lividity of the bodies; based on that assessment, he concluded the time of death was between 8:00 p.m. and 1:00 a.m. – a time frame that fit Snyder's version of events.   (Doc. No. 12-7 at 252.) Mr. Wertz argues Bryant should have done two things to demonstrate the murders occurred outside of this time frame.   First, he should have procured the testimony of Mark Sealy,[7] a field investigator from the state medical examiner's office, who wrote a report immediately after the murders stating the time of death was between 3:00 and 4:00 a.m.   (Doc. No. 1 at 48.)   Second, he should have sought to exclude Dr. Kokes's testimony under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), or retained a forensic pathologist to attack Dr. Kokes's methodology and cast doubt on his reliability.   (Doc. No. 1 at 49-50.)

Mr. Wertz's arguments regarding Bryant's failure to call Sealy and his failure to counter Dr. Kokes's testimony with that of an independent pathologist are subject to deferential review, as the Arkansas Supreme Court addressed them on appeal from the denial of Rule 37 relief.   The court held the arguments were conclusory and failed to demonstrate prejudice.   *Wertz*, 2014 Ark. 240, at 7-10, 434 S.W.3d at 901-903.   That conclusion is neither contrary to nor an unreasonable application of federal law, nor is it based on an unreasonable determination of the facts.   As the trial court pointed out, "Bryant was not able to locate Mark Sealey, however, the substance of his testimony regarding his opinion as to time of death was put before the jury."   *Id*. at 10, 434 S.W.3d at 903.   Specifically, Bryant cross-examined Dr. Kokes using Sealy's contemporaneous report and was able to get Dr. Kokes to acknowledge the time of death might have been later, depending on when Kathy Watts's body was rolled over by authorities responding to the crime scene.   (Doc. No. 12-8 at 30-33.)   In light of this admission, Mr. Wertz cannot demonstrate prejudice resulting

---

[7] The parties spell Sealy's last name differently.   I have adopted the spelling used in the trial transcript.   (Doc. No. 12-8 at 30.)

from the absence of Sealy or an independent pathologist.  Furthermore, Mr. Wertz suggests Sealy's testimony was necessary in order to have the report he authored admitted into evidence. (Doc. No. 1 at 48.)   But as was discussed at trial, Sealy was a field investigator whose role was to come to the crime scene and collect the bodies.  (Doc. No. 12-8 at 30-31.)   He would not have been qualified to give an expert opinion on time of death.   (*Id*. at 35-36.)

Mr. Wertz's argument regarding Bryant's failure to make a *Daubert* motion fails for similar reasons.  Bryant successfully cross-examined Dr. Kokes on the issue of the time of death and elicited an admission that his opinion was an estimate, that it depended on when authorities moved Kathy Watts's body, and that the time of death could have been hours later.[8]  (*Id*. at 30-33.)   The jury nonetheless believed Snyder's version of events.  Mr. Wertz cannot show the jury would have acquitted him had his counsel challenged Dr. Kokes's scientific methodology.

### 9.    Failure to Impeach Jamie Snyder, Jr.

Mr. Wertz argues Bryant should have cast doubt on Snyder's credibility, both by obtaining medical records showing he had a history of mental health problems and by obtaining telephone records showing no call from Mr. Wertz to Snyder on December 30, 1986.   (Doc. No. 1 at 50-51.) As Respondent points out, Bryant did impeach Snyder in various ways, eliciting testimony from Snyder that he had been charged with capital murder in connection with this case and his testimony against Mr. Wertz would help him get a better "deal."   (Doc. No. 12-8 at 159-161.)   Bryant was also able to elicit Snyder's admission that he had lied to police in the initial investigation (*id*. at 173-79), and Bryant's cross-examination pointed to several inconsistencies between Snyder's more recent statements and his trial testimony (*id*. at 180-95).   Additionally, evidence of Snyder's

---

[8] Dr. Kokes estimated the time of death based on photographs because the medical examiner and pathologist who actually performed the autopsies were unavailable for trial some twenty years later.   (Doc. Nos. 12-5 at 19, 12-7 at 232.)

mental health history was before the jury.   Bryant caused Snyder to admit to having had "a bad alcohol problem" and at least one suicide attempt.   (*Id*. at 163-64.)   Snyder also acknowledged he had been evaluated at the Arkansas State Hospital to determine his fitness to stand trial.   (*Id*. at 161-62.)   In short, Bryant thoroughly cross-examined Snyder and gave the jury several reasons to question his credibility; the jury apparently believed his testimony anyway.   Mr. Wertz has not demonstrated that Bryant was ineffective for failing to produce records or that the jury would have acquitted had he done so.

### 10.    Failure to Impeach Belinda Stewart

Mr. Wertz argues Bryant should have impeached his ex-wife, Belinda Stewart, by showing she was at one point considered an accomplice.   (Doc. No. 1 at 51-52.)   Specifically, he says Bryant should have shown that while investigators were interrogating her, they made reference to her getting a "deal," although ultimately she was never charged.   (*Id*.)   But as Respondent points out, any decision to avoid casting Stewart as an uncharged accomplice was one of trial strategy and is thus presumed to be "within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689.   Stewart's testimony directly implicated Mr. Wertz, and suggesting she may have been considered an accomplice at some point would do nothing to exculpate him.

In addition, Bryant cross-examined Stewart in great detail about the inconsistencies in her various statements.   (Doc. No. 12-8 at 102-28, 132-34.)   Stewart repeatedly admitted she lied during her interviews with investigators.   (*Id*. at 102, 104, 106, 108, 113, 122, 132-34.)   On two occasions during Bryant's cross-examination of Stewart, he requested and was granted an instruction explaining her inconsistent statements could be considered for the purpose of judging her credibility.   (*Id*. at 104-05, 109-10.)   Bryant's performance was reasonable in this regard, and

Mr. Wertz cannot show he was prejudiced by Bryant's decision to avoid mention of Stewart's own culpability.

### 11.    Failure to Impeach John Watts

Mr. Wertz claims Bryant performed deficiently by failing to impeach John Watts, Terry Watts's brother, who testified that he had accompanied Terry to pick up his daughter from the Wertzes' home in July 1986 and heard Mr. Wertz make a threatening remark.   (Doc. Nos. 1 at 52, 12-7 at 178-80.)   Mr. Wertz argues Bryant should have undermined this testimony by introducing the apparently contradictory account of a sheriff's deputy who was also present for the custody exchange.  (Doc. No. 1 at 52-53.)   As Mr. Wertz notes, Bryant mentioned this incident in his opening statement.   (Doc. No. 12-6 at 202, 217.)   He spoke about the "emotional" nature of child custody matters and suggested that, although Mr. Wertz had made "implied" threats, he had later "cool[ed] down" and had not acted on them.   (*Id.* at 201-202.)   Clearly, this was a strategic decision on Bryant's part to minimize the impact of John Watts's testimony.   Because "[w]e generally entrust cross-examination techniques, like other matters of trial strategy, to the professional discretion of counsel," I cannot say Bryant acted unreasonably in declining to impeach John Watts and instead choosing another method to blunt the impact of his testimony. *Ford v. United States*, 917 F.3d 1015, 1024 (8th Cir. 2019) (quoting *United States v. Villalpando*, 259 F.3d 934, 939 (8th Cir. 2001)).

### 12.    Failure to Object to Sheriff's Contact with Jury

Mr. Wertz contends Bryant should have moved for a mistrial or otherwise objected to Sheriff Weaver's contact with the jury.   (Doc. No. 1 at 53.)   He notes Sheriff Weaver escorted the jurors to and from the jury room and also says his wife observed Sheriff Weaver visiting with jurors while the trial judge and counsel were meeting in chambers.   (*Id.*)

Mr. Wertz acknowledges Sheriff Weaver's testimony focused only on "the background of the investigation." (*Id.*)   In fact, his testimony was totally uncontroverted.   (Doc. No. 12-8 at 49-54.)   Therefore, this case is substantially different from the case on which Mr. Wertz relies, *Turner v. Louisiana*, 379 U.S. 466, 473 (1965), wherein the United States Supreme Court found a Fourteenth Amendment violation in the "continual association throughout the trial" between jurors and two sheriff's deputies who testified.   The sheriff's deputies in *Turner* were "[t]he two principal witnesses for the prosecution." *Id.* at 467.   The Court emphasized that their testimony "was not confined to some uncontroverted or merely formal aspect of the case for the prosecution. On the contrary, the credibility which the jury attached to the testimony of these two key witnesses must inevitably have determined whether Wayne Turner was to be sent to his death." *Id.* at 473. Additionally, in *Turner*, the jurors were "continuously in the company of" the deputy sheriffs throughout the three days of trial. *Id.* at 468.   "The deputies drove the jurors to a restaurant for each meal, and to their lodgings each night.   The deputies ate with them, conversed with them, and did errands for them." *Id.*   The record in this case does not reveal the same kind of association.

In his Rule 37 petition, Mr. Wertz raised a claim regarding the "Sheriff's Office" speaking to the jury pool.   (Doc. No. 12-14 at 40.)   The trial court rejected this claim, stating it did not observe any misconduct on behalf of any employees of the sheriff's department with the jury.   (*Id.* at 446.)   This conclusion is due deference under 28 U.S.C. § 2254(d).   Mr. Wertz has failed to show Sheriff Weaver's contact with the jury rose to the level of a constitutional violation under *Turner*; accordingly, he cannot show Bryant was unreasonable in failing to object.

### 13.    Failure to Make Confrontation Clause Challenges

Mr. Wertz claims Bryant performed deficiently by failing to make two specific objections pursuant to the Confrontation Clause.   First, he argues Bryant should have objected to the testimony of Tom Garner, the attorney who wrote a will for Terry Watts shortly before his death. (Doc. No. 1 at 54.)   Garner testified that Watts had told him that, after the last custody hearing in Oklahoma, Mr. Wertz "had motioned [Watts] off to one side and just told him he was a dead man." (Doc. No. 12-7 at 222.)   Garner further testified that Watts was concerned and had told Garner he wanted his affairs in order in case something happened.   (*Id*. at 223.)   Respondent is correct that Terry Watts's comments to Garner do not fall under the Confrontation Clause because they were non-testimonial.   *See Crawford v. Washington*, 541 U.S. 36, 53-54 (2004) (the Confrontation Clause bars "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination"); *Davis v. Washington*, 547 U.S. 813, 821 (2006) (only testimonial statements cause the declarant to be a "witness" within the meaning of the Confrontation Clause).   The United States Supreme Court has held that a statement is not testimonial, and cannot fall under the Confrontation Clause, unless it is procured with the primary purpose of creating an out-of-court substitute for trial testimony.   *Ohio v. Clark*, ___ U.S. ___, ___, 135 S. Ct. 2173, 2180 (2015).   Here, it is obvious that the primary purpose of Terry Watts's comments to Garner was to procure a will, not to create evidence for Mr. Wertz's prosecution.   Accordingly, Bryant was not ineffective for failing to make a Confrontation Clause challenge.[9]

---

[9] In any event, Bryant did seek to exclude Garner's testimony – in a motion in limine (Doc. No. 12-4 at 64-65), at the pretrial hearing (Doc. No. 12-6 at 179-81), and at trial (Doc. No. 12-7 at 185).   Although he did not specifically reference the Confrontation Clause, he argued the testimony was improper because he would not be able to cross-examine Terry Watts about the perceived threat.   (Doc. Nos. 12-6 at 180, 12-7 at 185.)   This is the essence of the Confrontation Clause.

Second, Mr. Wertz contends Bryant should have objected to Dr. Kokes's testimony about the autopsy reports.  (Doc. No. 1 at 55-56.)   As previously noted, Dr. Kokes, Chief Medical Examiner at the time of trial, testified about the autopsies because the doctors who performed the autopsies – Dr. Fahmy Malak, Chief Medical Examiner at the time of the murders, and a consulting forensic pathologist – were unavailable.   As Respondent points out, Dr. Kokes did not serve as a "surrogate" for these unavailable witnesses, and the State did not introduce the autopsy reports authored by the unavailable witnesses.   (Doc. No. 12 at 87.)   Rather, Dr. Kokes offered his own expert opinions regarding the cause, manner, and time of death after reviewing the autopsy reports, autopsy photographs, toxicology reports, and crime scene photographs.   (Doc. Nos. 12-7 at 231-252, 12-8 at 3-48.)   At the time of trial and at the time direct review of Mr. Wertz's convictions became final, this type of testimony did not constitute a Confrontation Clause violation.   *See, e.g.*, *United States v. Richardson*, 537 F.3d 951, 960 (8th Cir. 2008) (an expert may offer "independent conclusions derived from another scientist's tests results" without violating the Confrontation Clause).   Therefore, Bryant did not perform deficiently by failing to object to Dr. Kokes's testimony.

### 14.     Failure to Object to Prejudicial Photographs

Mr. Wertz claims Bryant unreasonably failed to object to the admission of autopsy photographs on two grounds:  because they were not properly authenticated and because their probative value was substantially outweighed by the danger of unfair prejudice under Arkansas Rule of Evidence 403.   (Doc. No. 1 at 57-62.)   He contends the photographs were superfluous to the State's case and served no purpose but to inflame the jury.   (*Id*.)   He argues the autopsy photographs were even more prejudicial when compared to a family photograph of the Wattses

36

with Terry's daughter, which was introduced during John Watts's testimony.   (*Id*. at 62-64, Doc. No. 12-7 at 177-78, 180.)

The State admitted the autopsy photographs through the testimony of Dr. Kokes.   Mr. Wertz suggests Dr. Kokes could not properly authenticate the photographs because he was not present when they were taken.   But these photographs were arguably self-authenticating pursuant to Arkansas Rule of Evidence 902(4), as Dr. Kokes testified the autopsy reports were "duly attested to by the head of the State Crime Lab."   (Doc. No. 12-7 at 233.)   Otherwise, Rule 901(a) requires only "evidence sufficient to support a finding that the matter in question is what its proponent claims."   Even if the photographs were not self-authenticating, Dr. Kokes's testimony would be sufficient to satisfy this requirement.   *See* Ark. R. Evid. 901(b)(1) (the "[t]estimony of a witness with knowledge that a matter is what it is claimed to be" is sufficient authentication).

Moreover, while the autopsy photographs were undoubtedly disturbing and prejudicial, they were also probative.   Dr. Kokes referred to them in his testimony to explain the sequences of the Wattses' wounds and how they were killed.   (Doc. Nos. 12-7 at 233-252, 12-8 at 3-15.) Based on the photographs, he opined that Kathy Watts was shot while she was crouching down by the side of her bed (Doc. No. 12-7 at 245) and that the laceration to Terry Watts's neck "would have necessarily been made by a right handed person."   (Doc. No. 12-8 at 9.)   Thus, the photographs assisted the jury in understanding the State's theory of how the Wattses were killed. As for the family photograph, the record reflects that Bryant did object to its admission, saying there was "absolutely no probative value in that" and it served no purpose but to "cause sympathy for the victims."   (Doc. No. 12-7 at 177.)   For these reasons, Mr. Wertz has not demonstrated Bryant's performance was deficient.   Nor can Mr. Wertz establish prejudice, as he cannot show the jury would have acquitted him absent the photographs.

### 15.    Cumulative Prejudice

Mr. Wertz asserts all of Bryant's "objectively unreasonable errors and omissions"
prejudiced him when assessed cumulatively.   (Doc. No. 1 at 64.)   But "[n]either cumulative
effect of trial errors nor cumulative effect of attorney errors are grounds for habeas relief."
*Wainwright v. Lockhart*, 80 F.3d 1226, 1233 (8th Cir. 1996), *cert. denied*, 519 U.S. 968 (1996).
"Errors that are not unconstitutional individually cannot be added together to create a constitutional
violation."   *Id.*

### F.    *Brady* Violations

Mr. Wertz claims the State withheld several pieces of favorable, material evidence in
violation of *Brady v. Maryland*, 373 U.S. 83 (1963), including (1) test results from the glass, doors,
and beer cans recovered from the crime scene; (2) a psychological profile of the perpetrator created
by the Federal Bureau of Investigation; (3) promises of leniency to Belinda Stewart in exchange
for her testimony; and (4) information about other leads that investigators pursued in 1987.   (Doc.
No. 1 at 64-66.)   But Mr. Wertz implicitly acknowledges that some of this evidence was available
to him in spite of the State's alleged failure to disclose it.   Specifically, he faults Bryant for failing
to put before the jury evidence of the promises of leniency to Stewart[10]  and the alternative suspects
authorities investigated.   (*Id.* at 46-47, 51-52.)   "When information is readily available to the
defendant, it is not *Brady* material, and the prosecution does not violate *Brady* by not discovering
and disclosing the information."   *United States v. Jones*, 34 F.3d 596, 600 (8th Cir. 1994).

As previously noted, the glass and wood were retested pursuant to Mr. Wertz's request for
discovery in this case and did not yield any favorable or material information.   (Doc. No. 34.)

---

[10] The record confirms that Bryant did indeed have this evidence, as he cross-examined Stewart
using the transcripts of her interrogations.   (Doc. No. 12-8 at 102-28.)

Mr. Wertz admits the beer cans also failed to yield a possible alternative suspect. (Doc. No. 17 at 42.) Finally, Mr. Wertz acknowledges the FBI psychological profile may not exist at all. (Doc. No. 18 at 3.) Even if it does, Mr. Wertz cannot demonstrate prejudice resulting from the State's failure to disclose it, an essential element of a *Brady* claim. *See, e.g.*, *Strickler v. Greene*, 527 U.S. 263, 282 (1999). "The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Id.* at 289-90 (quoting *Kyles v. Whitley*, 514 U.S. 419, 434 (1995)). Mr. Wertz cannot demonstrate that his inability to access the FBI's educated guess about the perpetrator's characteristics rendered his trial unfair. Put another way, even if the profile had been favorable for him, suggesting the perpetrator had characteristics he did not, it could not "reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Id.* at 290 (quoting *Kyles*, 514 U.S. at 435).

G.    **Prejudicial Venue**

Mr. Wertz claims his constitutional rights were violated by his being tried in Sharp County, in light of the significant pretrial publicity and "hostile community sentiment." (Doc. No. 1 at 66.) This claim fails for the same reason his ineffective-assistance-of-counsel claim fails: the record reflects he was tried by an impartial jury. *See supra* § II. E. 4; *Snell v. Lockhart*, 14 F.3d 1289, 1294 (8th Cir. 1994) ("[S]o long as there is fair support in the record for the state court's conclusions regarding the jurors' impartiality, those conclusions should not be overturned in habeas proceedings.").

H.    **Lost Hair**

Mr. Wertz points to the Caucasian head hair found near the Wattses' front door – which, when tested in 1987, was found too limited in microscopic characteristics to be of any value – and

claims the State violated his rights by either losing or destroying it.   (Doc. No. 1 at 66.)   He argues the hair could now be retested using more sophisticated methods if it had not been lost.   (Doc. No. 17 at 61.)   But Mr. Wertz acknowledges he is required to show bad faith on the part of authorities in order to prove a due process violation.   *See Arizona v. Youngblood*, 488 U.S. 51, 58 (1988). Mr. Wertz offers nothing more than an admitted "inference" that the hair was purposefully removed from the bag that once held it.   (Doc. No. 17 at 61.)   This is not enough.

## I.    John Watts Testimony

Mr. Wertz claims his right to due process was violated by John Watts's allegedly untruthful testimony about the threatening comment he heard Mr. Wertz make to Terry Watts.   (Doc. No. 1 at 67.)   Mr. Wertz again refers to the apparently contradictory account of the incident given by a sheriff's deputy who was present for the custody exchange, and he implies this account was withheld from him in violation of *Giglio v. United States*, 405 U.S. 150 (1972).   Pursuant to *Giglio*, if the reliability of a witness may be determinative of guilt or innocence, the State's nondisclosure of evidence affecting the witness's credibility justifies a new trial.   *Id*. at 153-54. "We do not, however, automatically require a new trial whenever 'a combing of the prosecutors' files after the trial has disclosed evidence possibly useful to the defense but not likely to have changed the verdict.'   A finding of materiality of the evidence is required under *Brady*."   *Id*. at 154 (internal citations omitted).

Here, it is unclear whether *Giglio* applies at all, because Mr. Wertz only vaguely suggests that the statement of the sheriff's deputy was withheld.   In fact, elsewhere in his Petition, he faults Bryant for failing to interview the deputy, which implies Bryant could and should have known about the deputy's contradictory account.   (Doc. No. 1 at 52.)   But even assuming the statement was withheld, there was no due process violation.   In the deputy's account, according to Mr.

40

Wertz, Mr. Wertz did not want to hand over the child at the custody exchange and said, "You will have to take her." (*Id*.) This is not the same as saying he never issued the threat John Watts claimed to have heard. Additionally, unlike in *Giglio*, John Watts was not a key witness, and the case did not "depend[] almost entirely on" his testimony. 405 U.S. at 154. Therefore, at most, this evidence was "possibly useful to the defense but not likely to have changed the verdict." *Id*. It does not justify a new trial.

> **J.     Sheriff's Contact with Jury**

Mr. Wertz claims Sheriff Weaver's contact with the jury violated his right to due process. (Doc. No. 1 at 67.) As previously stated, Mr. Wertz has not established a due process violation under *Turner v. Louisiana*, 379 U.S. 466 (1965). *See supra* § II. E. 12.

> **K.     Confrontation Clause Violations**

Next, Mr. Wertz claims the State violated his rights under the Confrontation Clause by presenting Tom Garner's testimony about Mr. Wertz's threat to Terry Watts and Dr. Kokes's testimony about the autopsies. (Doc. No. 1 at 67.) For reasons previously explained, *see supra* § II. E. 13, Garner's testimony does not fall under the Confrontation Clause. And Dr. Kokes's testimony did not violate the Confrontation Clause because he was offering his own expert opinion based on materials he had reviewed. *See United States v. Richardson*, 537 F.3d 951, 960 (8th Cir. 2008). It is true that the law has changed somewhat since the time of trial. In *Bullcoming v. New Mexico*, 564 U.S. 647, 652 (2011), the United States Supreme Court held the testimony of a surrogate – "a scientist who did not sign the certification or perform or observe the test reported in the certification" – is not permitted for purposes of introducing a forensic laboratory report. But *Bullcoming* is distinguishable from the instant case because here the State did not seek to introduce the autopsy reports into evidence; instead, Dr. Kokes testified as to his independent opinions after

reviewing those reports and other materials.  In *Williams v. Illinois*, 567 U.S. 50, 66 (2012), a plurality of the Court recognized a distinction from the *Bullcoming* scenario where a testimonial report is relied on by a testifying expert but not admitted into evidence.  In any event, in accordance with *Teague v. Lane*, 489 U.S. 288, 310 (1989), *Bullcoming* is not applicable here because it is a new rule and Mr. Wertz's convictions became final before it was announced.  For these reasons, Mr. Wertz is not entitled to habeas relief based on his Confrontation Clause claims.

### L.    Appellate Counsel's Conflict of Interest

As Bryant continued to represent Mr. Wertz on appeal, Mr. Wertz claims his purported conflict of interest continued and affected his performance on appeal.  (Doc. No. 1 at 67-68.)  Specifically, Mr. Wertz notes Bryant failed to file a brief before the final extension deadline, though he was later granted permission to file a belated brief.  (*Id*.)  As previously discussed, Mr. Wertz has failed to show that Bryant actively represented conflicting interests and that an actual conflict of interest adversely affected his performance.  *See supra* § II. D.; *Strickland*, 466 U.S. at 692.  Even if he could demonstrate the existence of a conflict, Mr. Wertz cannot demonstrate any adverse consequence, given the fact that Bryant was ultimately granted permission to file a belated brief.

### M.    Ineffective Assistance of Counsel on Appeal

Mr. Wertz also contends Bryant unreasonably failed to brief multiple meritorious issues on appeal, including (1) that his hearing loss rendered him functionally absent from trial; (2) that Sharp County was a prejudicial venue; (3) that his rights under the Confrontation Clause were violated; and (4) that the admission of the autopsy photographs was error.  (Doc. No. 1 at 68-70.)  Because all of these issues are meritless, Bryant did not perform deficiently by failing to present them on appeal.  *See Dyer v. United States*, 23 F.3d 1424, 1426 (8th Cir. 1994) ("Dyer's claims

of ineffective assistance of counsel fail because we have just rejected as meritless the claim Dyer asserts counsel should have pursued.").

### N.    Ineffective Assistance of Counsel in Rule 37 Proceedings

Next, Mr. Wertz argues the attorneys appointed to represent him at the Rule 37 stage – W.H. Taylor, William B. Putman, and Jeff Mitchell – were deficient in their investigation, preparation, and presentation of his case.   (Doc. No. 1 at 70-71.)   Specifically, he contends his attorneys unreasonably failed to discover, develop, and present claims regarding actual innocence, his hearing loss, trial counsel's conflict of interest, ineffective assistance of trial counsel, the State's destruction of physical evidence, appellate counsel's conflict of interest, and ineffective assistance of appellate counsel.   (*Id*. at 71-73.)   But Mr. Wertz acknowledges (Doc. No. 17 at 66) that there is no freestanding right to effective assistance of counsel in postconviction proceedings. *See Martinez v. Ryan*, 566 U.S. 1, 17 (2012) (while a habeas petitioner may rely on the ineffectiveness of postconviction counsel to establish cause for a procedural default, 28 U.S.C. § 2254(i) precludes it as a ground for relief).

### O.    Cumulative Error

Finally, Mr. Wertz claims the cumulative effect of all the alleged constitutional errors rendered his trial fundamentally unfair.   (Doc. No. 1 at 74.)   As stated above, the Eighth Circuit does not recognize the cumulative error doctrine.  *See Wainwright v. Lockhart*, 80 F.3d 1226, 1233 (8th Cir. 1996), *cert. denied*, 519 U.S. 968 (1996).

### P.    Request for Evidentiary Hearing

Mr. Wertz is not entitled to a hearing.   As discussed throughout this recommendation, some of Mr. Wertz's claims were adjudicated on the merits in state court.   On those claims, a hearing is barred:   "[R]eview under § 2254(d)(1) is limited to the record that was before the state

court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011). Otherwise, the decision to grant an evidentiary hearing is generally left to the sound discretion of the district court. *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007). In deciding whether to grant an evidentiary hearing, a court must consider whether such a hearing could enable the petitioner to prove those factual allegations that, if true, would entitle him to habeas relief. *Id.* at 474. "It follows that if the record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing." *Id.* In this case, the record – including the results of the discovery – refutes Mr. Wertz's factual allegations. Even with the benefit of an evidentiary hearing, Mr. Wertz would not be able to develop a factual record that would entitle him to habeas relief.

## III. CERTIFICATE OF APPEALABILITY

Pursuant to Rule 11(a) of the Rules Governing Section 2254 Cases in the United States District Courts, a district court "must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). I find no issue on which Mr. Wertz has made a substantial showing of the denial of a constitutional right. Accordingly, no certificate of appealability should issue.

## IV. CONCLUSION

IT IS, THEREFORE, RECOMMENDED that:

1. Mr. Wertz's § 2254 Petition for Writ of Habeas Corpus (Doc. No. 1) be DISMISSED with prejudice.

2. A certificate of appealability not be issued.

3. Respondent's Motion and Amended Motion for Leave to File Response to

Petitioner's Notice of DNA Testing (Doc. Nos. 37, 38) be DENIED.

DATED this 19th day of December 2019.

_____
JOE J. VOLPE
UNITED STATES MAGISTRATE JUDGE